## Kentucky Traction & Terminal Company v. Wilson.

(Decided May 28, 1915.)

### Appeal from Franklin Circuit Court.

1. Negligence—Public Crossing—Care in Use of—Injury to Traveler —Action For.—Ordinarily, the giving of the signals mentioned in Section 700, Kentucky Statutes, in the manner therein indicated, is all that is required of a train or electric car in approaching a public crossing in the country, but where the crossing is especially dangerous, those in charge of the train or car and persons using the crossing, must exercise increased care, commensurate with the danger; and in an action for the death of, or an injury to the person or property of a traveler struck by a train or car at such crossing, the speed of the train or car may be taken into consideration with other facts shown by the evidence, in determining whether there was negligence on the part of the servants of the railroad company in charge of the train or car; and also in determining whether there was contributory negligence on the part of the person injured, or whose property was injured; and whether there was such negligence on the part of either; are questions that should be submitted under proper instructions to the jury.

2. Trial—Peremptory Instruction—When Not Authorized.—A peremptory instruction directing a verdict for the defendant should not be given, unless it conclusively appears that, admitting the plaintiff's evidence to be true, and every inference fairly deducible therefrom, he has failed to support his cause of action.

3. Damages—When Verdict For Will Not Be Disturbed on Complaint That Damages Are Excessive.—The Court of Appeals cannot act as a jury in determining what amount of damages should be awarded in a given case; and it is only when the verdict is so grossly or glaringly excessive as to appear at first blush to have resulted from passion or prejudice that it can interfere. The power should be sparingly exercised and only in extreme cases.

HAZELRIGG & HAZELRIGG, G. H. BRIGGS and WALLACE MUIR for appellant.

SCOTT & HAMILTON for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

The appellee, John Wilson, recovered in the court below a verdict and judgment for $4,000.00 damages against the appellant, Kentucky Traction & Terminal Company, $3.500.00 of which was awarded for injuries sustained to the person of appellee and $500.00 thereof for injuries to his threshing engine, wagon and horses. The appellant was refused a new trial, hence this appeal.

On the morning of June 13, 1913, appellee with his wheat-threshing outfit, consisting of a traction steam engine in front, water wagon attached thereto and a pair of horses led in the rear of the wagon, entered the Frankfort and Versailles turnpike in coming from Spring Station, at a point just beyond Duncan Station, about five miles from the city of Frankfort, travelling toward Frankfort. The traction engine was in charge of Ernest Wilson, a nephew of appellee, whose place was on the engine. The appellee was himself seated on the attached wagon immediately behind the engine. The engine and wagon were being propelled by the steam with which the engine was supplied and always operated. Near Duncan Station the Frankfort and Versailles turnpike is obliquely crossed by the railroad track owned by appellant and upon which its electric cars are run from Frankfort to Lexington, by way of Versailles. As appellee's engine and threshing outfit was passing over appellant's railroad track at and on this public crossing it was struck by one of appellant's electric cars coming from Frankfort, which knocked the fly wheel off the traction engine and otherwise damaged it, demolished the water wagon, killed one of the horses and threw the appellee with the debris of the wagon down an embankment and seriously injured him. The rear wheels of the traction engine had just left the railroad track when the colli-

sion occurred, but its fly wheel and rear end were enough over the track to cause the engine to be struck and damaged, and it was for the injuries thus sustained to his person and property that the damages were awarded appellee by the verdict and judgment mentioned.

The reversal of the judgment is urged by appellant upon the grounds: (1) That appellee's contributory negligence entitled it to a peremptory instruction directing a verdict in its behalf; (2) that the damages allowed are excessive and that the verdict was the result of passion or prejudice on the part of the jury.

The first contention is without support from the record. At the place of the accident appellant's railroad track approaches the crossing through a cut on a curve, there being an embankment on the east side of the cut that obstructs the view to the crossing, whether approached from the direction of Frankfort or Versailles. This bank practically extends the length of the cut, is about ten feet from the east rail of the track, is about four feet in height at the track, gets higher in the direction of the fence on that side and at its highest point so obstructs the view to the crossing that a person on a car coming from Frankfort, for a distance perhaps of 150 feet, would be prevented from seeing the crossing in approaching it; and persons seated on the engine and wagon, as were appellee and his nephew, in approaching the crossing from the direction of Versailles and at it, would be obstructed by the bank and curve from seeing, for as great a distance, a car approaching the crossing from Frankfort.

When the appellee's traction engine got within eight or ten feet of the crossing it was stopped by his nephew, who shut off the steam, left the engine and walked up the track and around the curve a hundred feet, to the most elevated point he could reach, and from that point took a view of the railroad track both in the direction of Frankfort and Versailles, to see if there was a car coming, having from that elevation a view of the track a half mile in each of these directions, but neither seeing nor hearing a car approaching, he returned at once to the engine, resumed his position thereon, turned on the steam and proceeded to cross the railroad track with the engine and outfit. At that time appellee was seated on the water wagon with his back toward Frankfort and his face in the direction of Versailles, that he might maintain a view of the track in the direction of Versailles, while his nephew, who was seated on the engine

with his face toward Frankfort, maintained a lookout for the coming of a car from that direction. While attempting to make the crossing under these circumstances the collision occurred in the manner previously stated.

According to the testimony of Ernest Wilson, the engineer in charge of the traction engine, the car suddenly appeared around the curve in front of him, running at a speed of not less than thirty miles an hour. He further testified that it gave no signal before reaching the curve and gave none after getting in view of the crossing except two blasts of the whistle immediately before the collision; that when the car first came into view he observed that the motorman, on the front platform of the car, was sitting down, probably upon a stool, apparently in a conversation with the conductor, at whose face he was looking, and that the conductor seemed to be looking at the motorman and talking to him. As appellee's back was toward the approaching car, he, of course, did not see it before the collision, but he testified that he heard no signal from the car until immediately preceding the collision.

Clarence Moore, a witness introduced in behalf of appellee, testified that he saw the collision and was standing at the time just below Duncan's store; that he did not see appellee's engine and threshing outfit until it got upon the crossing, at which time it was in motion and making the crossing of the railroad track. About the same time he saw the car coming; that it was running at a high rate of speed and did not sound its whistle until it gave the alarm signal, very near the crossing and immediately before the collision occurred. Moore was standing about seventy-five steps from the crossing and his position was such that he could see the crossing and the approaching car before it got to the crossing.

W. B. Jones, another witness introduced in appellee's behalf and who resides on the hill but a little distance from the crossing, testified that he was in his barn when the collision occurred, which was distinctly heard by him, and that he heard no signal from the car before the collision.

Albert Clark, another witness, testified that at the time of the collision he was at work in a field 200 yards distant; that he first saw the car after it passed Jetts station and when it was within a quarter of a mile of the crossing; that it was running at a high rate of speed and he did not hear it give any signal until the alarm whistle was sounded immediately before the collision.

Two or three other witnesses who, though not at the place of the collision, saw the car between Jetts station and Duncan station, testified that they did not hear from it any signal as it approached the crossing.

The motorman and conductor in charge of the car, upon being introduced in behalf of appellant, testified that the car, in approaching the crossing preceding its collision with appellee's engine and wagon, was running at a speed of fifteen or twenty miles an hour; that the whistle was sounded at the Mason gate with two long and two short blasts, and that Mason's gate was the point at which the signal for the Duncan crossing was required to be and was customarily given, that in approaching the crossing the motorman was maintaining a constant lookout from his position on the front platform of the car; that the presence of appellee's engine and threshing outfit upon the crossing was not discovered by the motorman or conductor until the car got to a point in the cut where the crossing was visible; that every effort and appliance was used to stop the car before it struck the engine and outfit, but proved unavailing; and that after the discovery by the motorman of the engine and outfit upon the crossing it was impossible to stop the car in time to prevent the collision. The motorman and conductor both denied that they were in a conversation on the front platform of the car just before reaching the crossing, as testified by Ernest Wilson, or that the conductor was then on the front platform at all.

There were three passengers on the car at the time of the collision, two colored boys, who were in the apartment used by that race, and a white woman. The two colored boys were introduced for appellant and both corroborated the testimony of the conductor and motorman as to the giving of the signal at the Mason gate, the speed of the car and what occurred immediately before and at the time of the collision.

In addition, Duncan, the owner of the store near the crossing, his wife and Ira Tatum, who lived with them, were introduced in appellant's behalf, all of whom testified that they heard but did not see the collision and that the car sounded its whistle when at or opposite Duncan's store.

We have refrained from referring to the testimony of L. D. Hollingsworth, a civil engineer, and that of other witnesses, as to the dangerous character of the public crossing where appellee sustained the injuries complained

of. It is sufficient to say that the dangerous character of the crossing is conceded by appellant.

It is manifest from the synopsis we have given of the evidence that appellant was not entitled to the peremptory instruction asked by it. "To authorize a peremptory instruction directing a verdict for the defendant, it must appear that, admitting the plaintiff's testimony to be true, and every inference fairly deducible therefrom, he has failed to support his cause of action. This rule for determining when the giving of a peremptory instruction is admissible, obtains in every action for death or personal injury from negligence, whether the peremptory instruction be asked on the ground that there is no evidence conducing to show the defendant's negligence, or on the claim that the contributory negligence of the deceased or injured person is established by the evidence." Haley's Admr. v. C. & O. Ry. Co., 157 Ky., 208; C., N. O. & T. P. Ry. Co. v. Rule, 142 Ky., 694; Southern Ry in Ky. v. Goddard, 121 Ky., 567.

The record here shows a contrariety of evidence on every issue of fact raised by the pleadings. There was, however, less conflict as to the question of contributory negligence than any other issue. The few circumstances from which appellant insists contributory negligence on the part of appellee is to be inferred, can have little weight in view of the positive testimony of appellee and Ernest Wilson as to the unusual care which was taken by the latter in attempting to avoid the collision.

Although the rule prevailing in some jurisdictions that requires one situated as was appellee to stop and look or listen before venturing upon a railroad crossing, does not obtain in this State, it was, nevertheless, literally obeyed by appellee or his nephew, for the latter took the precautions, before moving his engine and outfit upon the crossing, of stopping it and going to an elevated point nearby a view from which, he believed, would enable him to discover whether there was a probability of the coming of a car while his engine and outfit were upon the crossing.

It is, however, argued by counsel for appellant that Wilson ought to have known that the time occupied by him in returning from the place of observation to the traction engine was sufficient for the car, though it was not then in sight, to have reached the crossing before the traction engine and outfit could pass over it. This argument is speculative rather than logical. If Wilson

only walked at an ordinary gait, say three miles an hour, he would have walked at the rate of about 264 feet a minute, and if, as asserted by counsel, the point from which he made his observation of the railroad track was 150 feet from the traction engine, in returning to the engine he would have walked that distance in approximately 35 seconds. If he walked at more than an ordinary gait, as his testimony shows, he returned to the crossing in less time than we have indicated. He also testified that upon his return to the traction engine he at once got upon it and immediately proceeded to move it across the railroad track; and in view of the fact that there was no car in sight or hearing when he left the point of observation, and of the brief time consumed by him in returning to the traction engine and starting it over the crossing, the inference is inevitable that he did not and could not reasonably have expected a car to reach the crossing before he got the traction engine and attached outfit over and beyond it.

The jury were evidently of the opinion that the foregoing facts and circumstances were sufficient to show that neither appellee nor his engineer was guilty of contributory negligence; and, obviously, the evidence as a whole did not authorize the trial court to hold, as a matter of law, that appellee or his engineer, in attempting to cross the railroad track under the circumstances attending that act, was guilty of negligence but for which the injuries to the former's person and property would not have been received. So the case was properly allowed to go to the jury on that question as well as the issue as to appellant's negligence, evidence of which was furnished by appellee and his witnesses, to the effect: (1) that no signal was given of the coming of the car as it approached the crossing; (2) that the motorman failed to maintain a lookout from the car in approaching the crossing; (3) that the car was run at an unusual and dangerous rate of speed.

In view of the unusually dangerous character of the crossing at Duncan's Station, the rate of speed at which the car was running in approaching the crossing is a material question. Appellee's engineer, Ernest Wilson, and the witness Moore testified that the speed of the car was not less than thirty miles an hour, and that such was its speed is strongly shown by a circumstance deducible from the testimony of Ernest Wilson, which is, that although it was not in sight or hearing when Wil-

son left the elevated point to which he had gone to make an observation of the railroad track, yet within the brief time occupied by him in returning to the crossing, getting upon the traction engine and starting it over the crossing, the car not only got within view from the point of observation which Wilson had just left, but also reached the crossing before it could be cleared by the traction engine and attached outfit. According to the evidence a plain view could be had of the railroad track in the direction of Frankfort for a distance of a half mile or more, looking from the point of observation to which Wilson had gone, consequently this half mile must have been passed over by the car in smartly less than the time consumed by Wilson in returning to the traction engine, because it was not in view when he started on his return to the engine, and to have made the distance mentioned in the time indicated, its speed must have been greater than thirty miles an hour. If it be assumed, however, that as much time was consumed by the movements of the engine between the starting of it and the collision, as was consumed by Wilson in returning from the point of observation to the engine, it is still patent that the speed of the car was greater than thirty miles an hour.

Another circumstance demonstrating the speed of the car is the force of the collision, which was so great that it turned the traction engine, which was nearly as heavy as the car, so nearly around that its front practically faced the railroad track; knocked the body of appellee several feet beyond the crossing and carried the car double its length beyond the point of collision.

While ordinarily the giving of the signals mentioned in Section 786, Kentucky Statutes, in the manner therein indicated, is all that is required of a train or electric car in approaching a public crossing in the country, but where the crossing is especially dangerous those in charge of the train or car and persons using the crossing must use increased care, commensurate with the danger, and in an action for the death of, or for an injury to the person or property of a traveler struck by a train or car at such crossing, the speed of the train or car may be taken into consideration with other facts shown by the evidence, in determining whether there was negligence on the part of the servants of the railroad company in charge of the train; and also in determining whether there was contributory negligence on the part

of the person injured or whose property was injured; and the question whether there was such negligence on the part of either must be submitted under proper instructions to the jury for their decision. Hummer's Extr'x. v. L. & N. R. R. Co., 128 Ky., 486; C., N. O. & T. P. Ry. Co. v. Champ, 31 R., 1054.

There is no complaint of the instructions in this case, and our examination of them convinces us that they correctly advised the jury of all the law necessary to their guidance in arriving at a verdict.

Appellant's second and final complaint, as to the excessiveness of the verdict, cannot be sustained. The injuries sustained by appellee to his person consisted of a dislocated shoulder, a dislocated ankle, injuries to his back, legs and several cuts and bruises upon his person. According to the evidence he was confined to the hospital six days and to his bed, following his return to his home, three weeks. The injuries were sustained in June, 1913, and on the trial of this case, which occurred in April, 1914, the evidence showed that he was still suffering from the injuries received in the collision and had been able to do no work since they were received; that he has not the same use of the ankle, is troubled with numbness of the legs and almost constant pains in the back. Drs. Coblin and Hill, both of whom treated him for his injuries, testified that they are permanent, and the fact that appellee is fifty years of age seems to render his entire recovery hopeless. As to the injuries sustained to his property, the evidence conduced to prove that the value of the horse that was killed was $200.00; that the water wagon, an ordinary two-horse wagon, containing five barrels of water, which was totally destroyed, was of the value of $50.00; and that the damage to the engine, which originally cost $1,000.00, was from $300.00 to $500.00.

We think the damages allowed, both for the personal injuries of appellee and the injuries to his property, were liberal to the maximum, but we are not prepared to say that they are so grossly excessive as to exceed the bounds of reason or to appear to have been the result of passion or prejudice on the part of the jury. As said in L. & N. R. R. Co. v. Mitchell, 87 Ky., 37: "We are not acting as a jury, and it is only when the verdict is glaringly excessive and appears at first blush to have resulted from passion and prejudice that we can interfere. The power should be sparingly exercised and only in extreme cases. This is the policy of the law, reason-

ably and necessarily so." C., N. O. & T. P. Ry. Co. v. Champ, 31 R., 1054; L. & I. R. Co. v. Roemmele, 157 Ky., 84.

The record furnishes no ground for disturbing the verdict and the judgment is affirmed.